IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 13-cv-02812-BNB

RONI M. BROOKS, on behalf of N.N.F., a minor child,

Plaintiff,

v.

CAROLYN W. COLVIN, Commissioner of Social Security,

Defendant.

_____

**ORDER**

_____

This action seeks review of the Commissioner's decision denying the plaintiff's claim for children's supplemental security income benefits under Title XVI of the Social Security Act. The court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. § 1383(c)(3). The matter has been fully briefed, obviating the need for oral argument. The decision is AFFIRMED.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

On April 23, 2012, the plaintiff filed an application for supplemental security income benefits on behalf of her son, N.N.F., a child under age 18, with an alleged disability onset date of August 25, 2007. *Social Security Administrative Record* [Doc. #11] (the "Record"), pp. 102-111.[1]  The plaintiff described N.N.F.'s disabilities as bipolar disorder, violent tendencies, depression, anger, learning problems, difficulty focusing, and anxiety in public. Id. at p. 133.

_____

[1]I refer to the official page numbers of the Record which are found on the lower right-hand corner of each page, not to the page numbers that are assigned by the court's docketing system.

The application was denied on September 4, 2012.  Id. at p. 12.  The plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  Id.  The hearing was held on May 4, 2013.  Id. at p. 30.  N.N.F. was 16 years old at the time of the hearing.  Id. at p. 102.  On May 23, 2013, the ALJ issued a written decision finding that N.N.F. was not disabled as defined in the Social Security Act.  Id. at pp. 9-26.  The Appeals Council denied the plaintiff's request for review.  Id. at pp. 1-4.  The ALJ's decision is final for purposes of this court's review.

N.N.F. was born on November 26, 1996.  *Record*, p. 205.  He received routine checkups and treatment for viruses, ear infections, etc., from the Pediatric Associates of Canon City beginning with his three-week check up.  Id. at pp. 161-205.  N.N.F. was followed at the West Central Mental Health Center ("WCMHC") for bipolar affective disorder ("BPAD"), anxiety disorder, and attention deficit hyperactivity disorder ("ADHD") beginning in March 2010.  Id. at pp. 210-25.

On April 26, 2011, Ardis Martin, M.D., a physician at WCMHC, documented that N.N.F. arrived with his mother for a follow up appointment.  N.N.F. was 14 years old at the time. N.N.F. reported that he was doing well; was feeling tired because he had a sleepover with a friend and stayed up all night; was not depressed, anxious, or irritable; was eating and sleeping well; and denied suicidal ideation or self-injurious behavior.  His mother noted that his mood had been primarily even; he had minimal mood swings; and he had only brief episodes of depression or hypomania.  N.N.F. continued to be social with friends.  His mother noted that he was still behind in his social skills, but his brothers were "taking him out more" and there was a decrease in sibling issues.  N.N.F. was doing "okay in school, really well in classes he likes--art and science."  N.N.F. felt that Ritalin helped him focus.  He was taking Ritalin only for school.  He

was not experiencing any side effects from medications.  Dr. Martin documented that N.N.F. had

good grooming and hygiene; answered questions and "engaged"; had normal, non-pressured

speech; had good eye contact, euthymic affect, and a good mood; had linear but concrete thought

process; had fair insight and judgment; was not suffering from delusions or hallucinations; was

doing well emotionally and behaviorally; and was maintaining academically.  Dr. Martin

diagnosed N.N.F. with BPAD II, anxiety, and ADHD (inattentive type).  He was assigned a

global assessment of functioning (GAF) score of 60-65.[2]  He was continued on his medications

(Ritalin, Abilify, and Wellbutrin) and told to follow up in eight weeks.  Id. at p. 212.

N.N.F. saw Dr. Martin again on June 21, 2011.  N.N.F. reported that he was doing well;

enjoying the summer; playing a video game called World of Warcraft; and hanging out with his

siblings, friends, and girlfriend.  He finished school on-line and received good grades--80%

overall.  He was taking Ritalin when needed at 20 mg. per dose, but would resume the 30 mg.

dose when school started.  He was eating well and sleeping pretty well.  He had episodes of

decreased need for sleep a few times a week, but no mood issues or other manic symptoms

associated with the episodes.  He denied feeling depressed, anxious, or irritable.  He did not have

---

[2]Citing a text by the American Psychiatric Association, the ALJ stated:

> The GAF score is a clinician's rating of an individual's overall
> psychological, social and occupational functioning on a scale of 0
> to 100.  A rating of 41-50 indicates serious symptoms or any
> serious impairment in social, occupational, or school functioning.
> A rating of 51-60 indicates moderate symptoms or moderate
> difficulty in social, occupational, or school functioning.  A rating
> of 61-70 indicates some mild symptoms or some difficulty in
> social, occupational, or school functioning, but generally
> functioning pretty well, and has some meaningful interpersonal
> relationships.  Id. at p. 18.

any behavioral issues and was getting along better with his siblings.  Dr. Martin noted that

N.N.F. had good grooming and hygiene; was bright; had a good rapport with his mother; was not

defiant, irritable, or anxious; had normal, non-pressured speech; had good eye contact, a good

mood, euthymic affect, and a linear but concrete thought process; had fair to good insight and

judgment; was not suffering from delusions or hallucinations; and was continuing to do well.  He

was given the same diagnoses and a GAF score of 60-65.  He was continued on his medications

and told to follow up in eight weeks.  Id. at p. 213.

N.N.F. was seen on September 14, 2011, by Dr. Martin.  N.N.F. reported that he was

doing well; had a good summer; was eating well; was sleeping well for 9-10 hours a day; denied

feeling depressed, anxious, or irritable; and had good attention and school performance with

Ritalin.  His mother noted that his mood had been stable; his irritability with his siblings had

decreased; he had not had any manic episodes; and was doing "pretty well socially."  Dr. Martin

noted that N.N.F. had good grooming and hygiene; was a little tired; was engaged; had good

rapport with his mother; was not defiant, irritable, or anxious; had normal non-pressured speech

and good eye contract; had a good mood, euthymic affect, and linear but concrete thought

process; was not delusional and had no hallucinations; and had fair to good insight and

judgment.  He was given the same diagnoses and a GAF score of 60-65.  He was continued on

his medications and told to follow up in eight to twelve weeks.  Id. at pp. 214-15.

Dr. Martin saw the plaintiff again on December 15, 2011.  N.N.F. reported that he was

doing well; had a good Thanksgiving; was tired because he stayed up late playing video games;

did not feel depressed or irritable; had mild anxiety with meeting new people; and felt that

Ritalin helped him focus.  His mother noted that N.N.F. was able to go to Walmart and walk

around on his own; had an even mood overall; over the past two weeks, had been sleeping for two hours a night a couple of times a week then sleeping the next day; had not had mood changes or other manic symptoms; was possibly going through a growth spurt since he had been sleeping more; was eating normally; was getting along pretty well with his brothers; and had average to below average scores in his school work on some subjects, but planned to catch up over the Christmas break.  N.N.F.'s mother stated that she agreed Ritalin helped him focus.  Dr. Martin discussed watching for episodes of decreased need for sleep as well as other signs of mania.  He noted that N.N.F. had good grooming and hygiene; was tired, engaged, and had good rapport with his mother; did not show defiance, irritability, or anxiety; had normal, non-pressured speech; had good eye contact, good mood, and euthymic affect; had linear but concrete thought process; did not have delusions or hallucinations; and had fair to good insight and judgment.  N.N.F. was given the same diagnoses and a GAF score of 60-65.  He was continued on his medications and told to follow up in eight to twelve weeks.  Id. at pp. 215-16.

On March 31, 2012, N.N.F. was seen in the Emergency Room of Memorial Health System by Ellen McCormick because he had a seizure while at the zoo.  N.N.F. had never had a seizure prior to this instance.  He was awake and alert in the Emergency Room.  Dr. McCormick discharged him that day.  She stated that Wellbutrin slightly increased the risk of seizures and she suggested that N.N.F. stop taking Wellbutrin until she could talk to the physician that prescribed it.  She ordered him to follow up with his primary care provider.  Id. at pp. 152-158.

N.N.F. was seen by Dr. Martin on April 11, 2012.  N.N.F. reported that he was doing well.  His mother noted that since the Wellbutrin was discontinued, N.N.F. had been experiencing a worsening of his sleep and mood; there were 24 hour periods when he did not

sleep, then two to ten hours of sleep with return of energy; he was more irritable and aggressive; he was eating okay; and he had been more distractible, especially in elevated states. N.N.F. did not recall having low moods except when he was not getting along with his siblings. He noted occasional suicidal ideation during those encounters, but had no intent or current ideation. Dr. Martin documented that N.N.F. was well groomed; had good hygiene; was easily distracted with mild fidgeting but no defiance or acting out; had fair engagement, normal non-pressured speech, and normal eye contact; had a good mood, euthymic affect, and linear but concrete thought process; did not have delusions or hallucinations; and had fair to good insight and judgment. N.N.F. was given the same diagnoses and a GAF score of 50-55. The Ritalin was continued; the Abilify dose was increased; and N.N.F. was put on a low dose of Trileptal for further mood stabilization. N.N.F. was told to follow up in three weeks. Id. at pp. 216-17.

Subsequently, N.N.F. was seen again at WCMHC.[3] N.N.F. reported that he was doing well. His mother reported that he was doing better but was still easily annoyed and depressed when disappointed by his brothers or when he did not want to do certain activities. He tolerated the increase in Abilify and the start of Trileptal. He was sleeping better, eating okay, and concentrating okay. He reported feeling upset when his brother let him down and had thoughts of wanting to die, but denied a desire to die. His mother noted that he was more irritable and easily annoyed by those around him. His denied feeling depressed without reason; the depression was always triggered. His mother noted that his EEG was normal and that they planned to follow up with a neurologist to figure out why he had a seizure. The care provider documented that N.N.F. was well groomed with good hygiene; was easily distracted with mild

_____

[3]This record is not dated, nor does it contain the name of the care provider.

fidgeting; had no defiance or acting out; was able to stop play and talk about behaviors, feelings, and suicidal thoughts; had some difficulty expressing himself, but did try and was engaged; had normal non-pressured speech, good eye contact, good mood, and euthymic affect; had linear but concrete thought process; had no delusions or hallucinations; and had fair to good insight and judgment.  N.N.F. was given the same diagnoses and a GAF score of 50-55.  A discussion was held about the benefits of N.N.F. returning to therapy.  The Ritalin and Ability were continued and the Trileptal was increased for better mood control.  Id. at p. 218.

Subsequently, N.N.F. was seen again at WCMHC.[4]  N.N.F. reported that he was doing well.  He tolerated the increase in Trileptal with good effect and no side effects.  His mother felt that he was doing better.  N.N.F. denied feeling depressed or anxious.  He also denied suicidal ideation.  He was eating well and sleeping well unless he stayed up playing video games.  His mother noted that his mood had been "more up but overall stabilized."  He did not experience mania and had occasional mild hypomania.  His concentration was normal.  N.N.F. noted mild irritability when his siblings teased him, but it was getting better.  The care provider documented that N.N.F. was well groomed; had good hygiene; was engaged, brighter, more focused and on task, and had good rapport with his mother; had normal non-pressured speech and good eye contact; had a good mood, an euthymic affect, and linear but concrete thought process; did not have delusions or hallucinations; and had fair to good insight and judgment.  N.N.F. was given the same diagnoses and a GAF score of 60.  His medications were continued and he was told to follow up in eight weeks.  Id. at p. 224.

---

[4]This record is not dated, nor does it contain the name of the care provider.

In August 2012, the State agency psychological and medical consultants, James Wanstrath, Ph.D., and Chrys Synstegard, M.D., opined that N.N.F. had less than marked limitations in (1) acquiring and using information because he did okay in school when on medications; (2) attending and completing tasks because although he had some problems with focus, his medications helped; (3) interacting and relating with others because he had clear speech; (4) caring for himself because he was capable of performing his activities of daily living and does okay when on medications but has problems with self-regulation; and (5) health and physical well-being because although he does not have limitations based on his mental condition, he did have a seizure while on Wellbutrin. The consultants also found that N.N.F. had no limitation in moving about and manipulating objects. Id. at pp. 56-7.

On August 30, 2012, N.N.F. saw Mike Gummow, M.D., at WCMHC for a follow up visit. N.N.F.'s mother reported that N.N.F.'s behavior had been "pretty much the same" and that he had been doing "really well" and seemed to be "pretty level." She reported that she often caught him staying up later than he should. Dr. Gummow documented that N.N.F. was significantly tired; was appropriately groomed and dressed; fell asleep frequently during the appointment; had an euthymic mood with a full affect; had good eye contact when awake; had speech notable for a lack of spontaneity; had no issues with language; had linear and goal-directed thought process; was appropriately oriented; did not have any gross deficits with memory or concentration; had age appropriate insight and judgment; and overall was very pleasant, polite, and cooperative. N.N.F. was given the same diagnoses. His Ritalin was discontinued and replaced with Concerta to provide longer ADHD symptom coverage. Dr. Gummow noted that N.N.F.'s family had been contacted by WCMHC about initiating

psychotherapy.  Dr. Gummow assigned N.N.F. a GAF score of 59.  N.N.F. was told to return to the clinic in two weeks.  Id. at pp. 245-46.

N.N.F. saw Dr. Gummow on September 12, 2012.  N.N.F. reported that the Concerta was "really good" because he noticed that he was starting to "work a lot more," including homework and chores.  His mother reported that he was sharper and had more to say about each subject.  She stated that N.N.F. is "very smart" and "it comes out when he's clear."  N.N.F. stated that his mood was "really good," and his mother agreed.  His mother reported good reports regarding school.  However, N.N.F. was only able to work/study for 20 minutes before needing a break.  Dr. Gummow documented that N.N.F. yawned often but otherwise appeared alert; was appropriately groomed and dressed; had an euthymic mood with a bright affect; had good eye contact; had speech notable for a lack of spontaneity; had no issues with language; had linear and goal-directed thought process; was appropriately oriented; did not have any gross deficits with memory or concentration; had age appropriate insight and judgment; and overall was very pleasant, polite, and cooperative.  Dr. Gummow assigned N.N.F. a GAF score of 62.  Dr. Gummow increased the Concerta dosage and told N.N.F. to return to the clinic in two weeks.  Id. at pp. 244-45.

On September 25, 2012, N.N.F. saw Dr. Gummow.  N.N.F. reported that with his increased dosage of Concerta, he was more "yappy." His mother stated that he was able to talk more coherently about subjects and his grades improved from a D and an F to two Cs.  N.N.F. stated that he believed his current dose of Concerta was appropriate, and his mother agreed.  His mother reported that N.N.F. was doing tasks better, sometimes without being told, although she had to remind him to use deodorant and brush his teeth.  N.N.F. reported that he was trying to eat

more healthy foods and that he was walking more and running for exercise.  Dr. Gummow documented that N.N.F. was alert; appropriately groomed and dressed; had a euthymic mood with a bright affect; had good eye contact; had speech notable for a lack of spontaneity but language without issues; had linear and goal-directed thought process; was appropriately oriented; had age appropriate insight and judgment; and overall "was very pleasant, polite, and cooperative."  His medications and diagnoses remained the same.  Dr. Gummow assigned N.N.F. a GAF score of 66.  N.N.F. was told to return to the clinic in two months.  Id. at pp. 242-44.

N.N.F. saw Dr. Gummow again on November 20, 2012.  N.N.F.'s mother stated that he was doing good in school.  N.N.F. stated that overall he was functioning "good, good."  His mother agreed and stated that he had been "pretty stable."  N.N.F. noted that his anxiety was "off and on."  His mother stated that he was most anxious during large family gatherings and at Walmart.  N.N.F. replied that anxiety at Walmart only occurs "sometimes."  N.N.F. had reduced his daily Mountain Dew intake from 64 ounces to 32 ounces.  Dr. Gummow documented that N.N.F. was alert and appropriately groomed and dressed; had an euthymic mood with a full affect and frequent appropriate smiles; had good eye contact; had speech notable for a lack of spontaneity but no issues with language; had linear and goal-directed thought process; was appropriately oriented; did not have any gross deficits with his memory or concentration; had age appropriate insight and judgment; and overall,"was his usual very pleasant, polite, and cooperative self."  N.N.F.'s diagnoses and medications remained the same.  He was encouraged to continue to decrease his caffeine consumption to decrease his anxiety issues.  Dr. Gummow assigned N.N.F. a GAF score of 67.  He was scheduled to return to the clinic in two months.  Id. at pp. 241-42.

On January 22, 2013, N.N.F. saw Dr. Gummow for a follow up visit.  When asked about any anxiety issues over the last month, N.N.F. stated "Good, but I don't leave the house much." His mother stated that she thought he was doing "really well."  He was going to his friend's house and was going to buy a soda on his own.  N.N.F. had recently completed finals and passed two out of three courses.  His mother stated that he "barely missed passing the third."  N.N.F. had weekly academic counseling sessions via the telephone, attended a one hour class at school per week for each of his classes, and completed the remainder on-line at home.  He stated that his mood was good since his last appointment, and his mother agreed.  N.N.F. reported sleeping "a lot."  Dr. Gummow noted that N.N.F. "continues to consume about 32 oz of Mountain Dew per day."  He further noted that N.N.F. was moderately somnolent with frequent yawns; was appropriately groomed and dressed; had euthymic mood with a full affect and frequent appropriate smiles; had good eye contact; had speech notable for a lack of spontaneity but his language was without issues; his psychomotor was notable for mild retardation; had linear and goal-directed thought process; was appropriately oriented; did not have any gross deficits with memory or concentration; had age appropriate insight and judgment; and overall N.N.F. "was his usual very pleasant, polite, and cooperative self."  Dr. Gummow assigned N.N.F. a GAF score of 67.  N.N.F. was given the same diagnoses; he was encouraged to taper his caffeine consumption "given the continuing anxiety issues reported today"; he was continued on Concerta, Trileptal, and Abilify; and he was told to return in two months.  Id. at pp. 240-41.

On May 1, 2013, the plaintiff's attorney sent N.N.F. to a child functional assessment with Ashley Phelps, Ph.D.  Dr. Phelps found that N.N.F. evidenced notable anxiety, simplistic speech, and difficulty answering many of the questions asked of him.  Dr. Phelps stated that N.N.F.

appeared to be socially inhibited; demonstrated difficulty maintaining focus and tracking the conversation; looked about the room frequently; disengaged from the conversation at times; "attempted to answer questions but appeared unable to fully formulate or articulate anything more than a simple response"; and frequently "did not understand the actual intent of the question asked and responded irrelevantly although he appeared to think he was answering the question posed." Dr. Phelps found that N.N.F.'s thought processes were generally coherent but "demonstrated little to no goal direction or elaborative thought process."

Dr. Phelps stated that N.N.F.'s testing had to be conducted over a three day period due to his distractibility, labile mood, and lack of attentiveness. She diagnosed him with bipolar disorder II, ADHD (predominately inattentive type), and anxiety disorder. She assigned him a GAF of 50-55. She found that he had a marked limitation in the ability to maintain attention and concentration for extended periods; a less than marked limitation in the ability to prevent inappropriate degrees of impulsiveness; a less than marked limitation in the ability to prevent inappropriate degrees of hyperactivity; a marked limitation in the ability to maintain age-appropriate cognitive/communicative functions; a less than marked limitation in the ability to maintain age-appropriate social functioning; a marked limitation in the ability to maintain age-appropriate personal functioning; and a marked limitation in the ability to maintain concentration, persistence, and pace. Dr. Phelps further found that N.N.F. had a marked limitation in acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for himself. She found that he had a less than marked limitation in health and physical well-being and no limitation in moving about and manipulating objects. Id. at pp. 247-54.

N.N.F. and his mother (the plaintiff) both testified at the ALJ hearing on May 14, 2013. Id. at pp. 30-48.  The plaintiff testified that over the last couple of months she noticed that N.N.F.'s maturity level decreased; that he seems "a lot younger now" because he was playing with Bionicles.  Id. at p. 35.

The plaintiff stated that N.N.F. is home schooled and is at an eighth grade level but is in the ninth grade.  Id. at pp. 35-36.  The plaintiff has home schooled N.N.F. since the fifth grade. Id. at p. 37.  The plaintiff has difficulty home schooling N.N.F. because she has bipolar disorder.[5]  The plaintiff has problems keeping N.N.F. focused on class work because he is very easily distracted.  Id. at p. 36.  N.N.F. has days where he can do school work for up to three hours and other days where he can only do school work for an hour.  He has bad school days three days a week.  On a bad day, he gets angry, blows up, and yells "about really silly things" like "[m]y brothers hate me, you hate me."  Everything is "really extreme" and "nothing's thought through."  Id. at p. 40.

N.N.F. goes to his friend's house by himself.   Id. at p. 36.  He gets nervous around other people.  He will hide in his room, and he "kind of folds into himself" when the plaintiff takes him to family functions and church.  He has one friend that he grew up with.  Id. at p. 37.  N.N.F. shops on his own while at Walmart with his mother.  The plaintiff needs to tell N.N.F. to take a shower, use deodorant, and brush his teeth.  He will follow only one directive at a time.  Id. at p. 39. The plaintiff has to give N.N.F. his medications.  Id. at p. 41.

---

[5]The plaintiff testified that she is on disability for bipolar disorder.  Id. at p. 36.  The ALJ noted that her next hearing was for one of N.N.F.'s siblings.  Id. at p. 38.

N.N.F. testified that he has problems in school learning new concepts because he gets distracted.  He stated that "most things" distract him and that he is distracted all of the time.  <u>Id.</u> at p. 42.  However, he is not as distracted when he is playing video games.  He can focus on a video game for 1½ to 2 hours.   Then he gets bored and does "other stuff" like drawing.  He sometimes does an entire drawing, but most of the time he is unable to complete a drawing because he gets distracted.  <u>Id.</u> at p. 43.  He will come back to the drawing if it is something he likes.  <u>Id.</u> at p. 44.

N.N.F. testified that he has "a lot of anxiety" whenever he is near people.  He gets "really nervous" and his "heart starts to beat" and he has "to walk away."  <u>Id.</u>  He can sometimes return to the situation depending on how "they react" if he goes "back in to that thing."  He even has problems with his family members.  <u>Id.</u> at p. 45.

He plays a world-wide video game called World Warcraft.  <u>Id.</u>  He is at a level 90, which is "pretty good."  He does not play against others; he just likes "doing the storyline."  He agreed that the game is fairly complicated.  He buys video games by himself at Walmart.  <u>Id.</u> at p. 46.

## II.  STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), a court may render "upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  Review of the Commissioner's disability decision is limited to determining whether the ALJ applied the correct legal standard and whether the decision is supported by substantial evidence.  <u>Hamilton v. Secretary of Health and Human Services</u>, 961 F.2d 1495, 1497-98 (10th Cir. 1992); <u>Brown v. Sullivan</u>, 912 F.2d 1194, 1196 (10th Cir. 1990).  Substantial evidence is evidence a reasonable

mind would accept as adequate to support a conclusion.  Brown, 912 F.2d at 1196.  It requires

more than a scintilla but less than a preponderance of the evidence.  Hedstrom v. Sullivan, 783 F.

Supp. 553, 556 (D. Colo. 1992).  "Evidence is not substantial if it is overwhelmed by other

evidence in the record or constitutes mere conclusion."  Musgrave v. Sullivan, 966 F.2d 1371,

1374 (10th Cir. 1992).  Further, "if the ALJ failed to apply the correct legal test, there is a ground

for reversal apart from a lack of substantial evidence."  Thompson v. Sullivan, 987 F.2d 1482,

1487 (10th Cir. 1993).  Although a reviewing court should meticulously examine the record, it

may not reweigh the evidence or substitute its discretion for that of the Commissioner.  Id.

### III.   THE LAW

A person under the age of 18 is disabled within the meaning of the Social Security Act if

he or she has "a medically determinable physical or mental impairment or combination of

impairments that causes marked and severe functional limitations, and that can be expected to

cause death or that has lasted or can be expected to last for a continuous period of not less than

12 months."  20 C.F.R. § 416.906.  No individual under the age of 18 will be considered disabled

if he or she is engaging in substantial gainful activity.  Id.

The Social Security regulations set forth a three-step sequential process to determine

whether an individual under the age of 18 is disabled under Title XVI of the Social Security Act.

20 C.F.R. § 416.924.  At step one, a child will not be deemed disabled if he or she is working

and such work constitutes substantial gainful activity.  If the child is not engaging in substantial

gainful activity, the analysis proceeds to the second step.  Id. at § 416.924(a) and (b).  At step

two, it must be determined whether the child suffers from a medically determinable impairment

or a combination of impairments that is severe.  If the child has an impairment or combination of

impairments that is not severe, the child is not disabled and the analysis is terminated.   If the impairment or combination of impairments is severe, the analysis proceeds to step three.   Id. at § 416.924(a) and (c).   At step three, a child's impairment or combination of impairments must meet, medically equal, or functionally equal the severity of the listings found in 20 C.F.R. Part 404, Subpart. P, Appendix 1 (the "Listings"), and the duration requirement of at least 12 months. Id. at § 416.924(a) and (d).

## IV.   ANALYSIS

The ALJ found that N.N.F. (1) has not engaged in substantial gainful activity since the application date, April 23, 2012; (2) has the following severe impairments: bipolar affective disorder II, anxiety disorder, ADHD, and personality disorder; (3) does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R.Part 404, Subpart. P, Appendix 1; (4) does not have an impairment or combination of impairments that functionally equals the severity of the Listings; and (5) has not been disabled as defined in the Social Security Act since the application date, April 23, 2012.   Id. at pp. 15-26.

The plaintiff claims that the ALJ failed to properly (1) consider Listing 112.11; and (2) weigh the opinion evidence.   *Plaintiff's Opening Brief*, pp. 9, 13.

## A.   Consideration of Listing 112.11

The plaintiff argues that the ALJ erred because she (1) failed to state whether N.N.F. met or equaled Listing 112.11, and (2) failed to weigh Dr. Phelps's opinion regarding N.N.F.'s ADHD which supports a finding that N.N.F. meets the Listing.   *Plaintiff's Opening Brief*, p. 12.

"The listings set out at 20 CFR pt. 404, subpt. P, App. 1 (pt. A) (1989), are descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect.  Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results."  Sullivan v. Zebley, 493 U.S. 521, 529-30 (1990).  "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  Id. at 530.

Listing 112.11 is the listing for ADHD and requires medically documented findings of marked inattention, marked impulsiveness, marked hyperactivity, and other age-appropriate criteria.  The ALJ expressly found that N.N.F. does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Record*, p. 15.  When discussing the listing requirements for Listing 112.06, the ALJ found that N.N.F. did not meet or equal the required criteria of that listing which "requires medically documented findings of marked inattention, marked impulsiveness and marked hyperactivity as well as evidence must establish marked impairment or difficulties in" two age-appropriate criteria.  Id. at p. 16.  In addition, the ALJ stated that Listing 112.11 "requires medically documented findings of marked inattention, marked impulsiveness and marked hyperactivity as well as evidence must establish marked impairment or difficulties in" two age-appropriate criteria.  Id.  Although it appears that the ALJ inadvertently transposed Listing 112.06 and Listing 112.11, it is clear from the record that she found N.N.F. did not meet or equal any of the Listings, including Listing 112.11.

The plaintiff argues that the ALJ erred because she "did not mention or weigh Dr. Phelps's opinion regarding the child's Attention Deficit Hyperactivity Disorder," and Dr. Phelps's opinion supports a finding that N.N.F. meets Listing 112.11 "because Dr. Phelps stated that N.N.F. was markedly impaired in the ability to maintain attention and concentration for extended periods; the ability to maintain age-appropriate cognitive/communicative functions; the ability to maintain age-appropriate personal functions; and the ability to maintain concentration, persistence, and pace. *Plaintiff's Opening Brief*, p. 11. The defendant asserts that Dr. Phelps's ADHD opinion demonstrates that N.N.F. does not meet Listing 112.11. Therefore, any failure to specifically address the ADHD opinion is harmless error. *Defendant's Opening Brief*, pp. 11-12.

Listing 112.11 requires that the claimant demonstrate marked inattention, marked impulsiveness, and marked hyperactivity. 10 C.F.R. Part 404, Subpart P, Appendix 1, § 112.11. Although Dr. Phelps opined that N.N.F. has marked inattention, she also opined that N.N.F. has less than marked impulsiveness and hyperactivity. *Record*, p. 252. Therefore, her opinion does not support a finding that N.N.F. meets Listing 112.11 for ADHD. Any failure by the ALJ to mention or weigh Dr. Phelps's ADHD opinion is harmless because the opinion is consistent with the ALJ's decision. Keyes-Zachary v. Astrue, 695 F.3d 1156, 1165 (10th Cir. 2012).

In her Reply Brief, the plaintiff concedes that Dr. Phelps's opinion does not support a finding that N.N.F. **meets** Listing 112.11 and instead argues it is not clear from the ALJ's decision whether N.N.F. **equals** Listing 112.11.[6] *Plaintiff's Reply Brief*, p. 3. I will not address

---

[6]An impairment(s) is medically equivalent to a listed impairment "if it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a). If a claimant has an impairment that is listed in Appendix 1, and the claimant exhibits all of the findings but one or more of the findings is not as severe as specified in the listing, the claimant's impairment is equivalent to the listing if the individual has other findings related to the

an argument raised for the first time in a reply brief.  Stump v. Gates, 211 F.3d 527, 533 (10th

Cir. 2000) (court will not ordinarily review issues raised for the first time in reply brief).

### B.   Weight of the Opinion Evidence

The plaintiff argues that the ALJ failed to properly weigh the conflicting opinions of Dr.

Phelps and the State agency psychologist.  *Plaintiff's Opening Brief*, p. 13.  The plaintiff states

that the ALJ erred because she did not "establish that she considered all" six factors set forth in

20 C.F.R. § 416.927(c) when giving "great weight" to the opinion of the State agency

psychiatrist and giving "little weight" to Dr. Phelps's opinion.

The ALJ is not required "to apply expressly each of the six relevant factors in deciding

what weight to give a medical opinion."  Oldham v. Astrue, 509 F.3d 1254, 1258 (10th Cir.

2007).  The ALJ's decision need only be "sufficiently specific to make clear to any subsequent

reviewers the weight the adjudicator gave to the treating source's medical opinion and the

reasons for that weight."  Id.

The ALJ provided a detailed summary of the medical evidence from WCMHC.  In

determining that Dr. Phelps's opinion was entitled to little weight, the ALJ explained:

> On May 1, 2013, the claimant attended a child functional
> assessment with Ashley Phelps, Ph.D., after referral from the
> claimant's representative.  The claimant's mother reported that the
> claimant was 11 years old when she noticed a change in his mood
> and behavior.  She asserted that the claimant began having
> significant mood swings and had problems in school with an
> inability to remain attentive, which resulted in the claimant being
> home schooled.  Ms. Brooks asserted that the claimant earned
> grades ranging from Cs to Fs due to increased inattention and low

---

impairment "that are at least of equal medical significance to the required criteria."  20 C.F.R. §
416.926(a).  The plaintiff does not argue that N.N.F. equals Listing 112.11; she argues that the
ALJ erred because she did not make clear in her decision whether N.N.F. equals the Listing.

motivation.  The claimant's mental status examination showed that he was normally groomed, had normal speech, had difficulty maintaining focus, and was disengaged from conversation at times. The claimant had little to no goal direction or elaborative thought process, but his thought processes were generally coherent.  Over the testing days, the claimant became less anxious, appeared to be in better spirits, and was energetic.  Dr. Phelps noted that the claimant was very poor in social adjustment and personal adjustment in comparison to peers his own age.  Dr. Phelps diagnosed the claimant with bipolar II disorder, ADHD, inattentive type, and anxiety disorder, and assigned a GAF score of 50 to 55. Dr. Phelps concluded that the claimant had marked limitation in acquiring and using information, marked limitation in attending and completing tasks, marked limitation in interacting and relating with others, no limitation in moving about and manipulating objects, marked limitation in caring for himself, and less than marked limitation in health and physical well-being (Exhibit 12F, pages 1-4, 7-8).  The undersigned gives very little weight to Dr. Phelps's opinion, as it is not consistent with or supported by the objective evidence of record.  As discussed in detail above, the claimant's treatment records show that he has repeatedly denied anxiety, he and his mother have repeatedly acknowledged that the claimant was doing well with a stable mood, and the claimant has reported mild to no depression.  Further, the records show that the claimant hangs out with friends, has a girlfriend, was making good grades, and went alone to buy sodas.  Although the treatment notes show that in December 2011, the claimant reported that he was behind in school, he reported that he planned to catch up over the Christmas break.  The treatment records show that the claimant is much improved with medications.  Further, it appears that Dr. Phelps did not take into consideration the complexity of the video games that the claimant plays, including being at the advanced level of World of Warcraft, shopping for games, and other rewards.  The treatment records, discussed in detail above, do not support Dr. Phelps's one-time evaluation and her opinion is therefore given little weight.

*Record*, pp. 19-20.

In finding that the state consultants' opinion was entitled to great weight, the ALJ

explained:

20

The State agency psychological and medical consultants, James J. Wanstrath, Ph.D. and Chrys Syndstegard, M.D., opined that the claimant had less than marked limitation in acquiring and using information because the claimant was okay in school when on medication; less than marked limitation in attending and completing tasks because although he had some problems with focus, his medications helped; less than marked limitation in interacting and relating with others, as the evidence showed the claimant had clear speech; no limitation in moving about and manipulating objects; less than marked limitation in caring for himself due to problems with self-regulation; and less than marked limitation in health and physical well-being due to one seizure caused by the claimant's medications (Exhibits 2A, pages 7-8; 8F). The undersigned gives great weight to the State agency consultant's opinions, as they are consistent with and supported by the record, discussed above. Therefore, the undersigned has incorporated their assessed limitation and finds that the claimant has less than marked limitation in acquiring and using information, attending and completing tasks, interacting and relating with others, caring for himself, and in health and physical well-being, and no limitation in moving about and manipulating objects.

Id.

Thus, the ALJ provided a sufficiently specific decision that makes clear the weight she gave to Dr. Phelps's opinion and the State agency consultants' opinion and the reasons for that weight. Substantial evidence exists to support the ALJ's decision, notably the medical records from WCMHC which document twelve visits over almost two years. With the exception of the visits following N.N.F.'s seizure and subsequent adjustment of medication, the care providers at WCMHC consistently documented that N.N.F. was able to answer questions; was appropriately oriented; had no issues with language; did not have any gross deficits with memory or concentration; was engaged; had good eye contact, euthymic affect, and a good mood; had linear and goal directed thought process; had age appropriate insight and judgment; was pleasant, polite, and cooperative; was doing well emotionally and behaviorally; was maintaining

21

academically; and had GAF scores above 60.  The last documented visit with Dr. Gummow

occurred three months before the appointment with Dr. Phelps.  Dr. Gummow documented that

N.N.F had a GAF score of 67, and his mother stated she thought N.N.F. was doing "really well."

## V.  CONCLUSION

I have reviewed the entire record.  The record contains substantial evidence to support

the ALJ's decision, and the correct legal standards were applied.  I find no error in the ALJ's

decision.  Accordingly,

IT IS ORDERED that the decision of the Commissioner is AFFIRMED.

Dated December 16, 2014.

BY THE COURT:

 s/ Boyd N. Boland                           
United States Magistrate Judge